No. 91.—DAWSON A. WALKER, guardian, &c. plaintiff in error, *vs.* ANDREW J. WELLS, defendant in error.

[1.] In England a grant is issued by the Lord Chancellor, and a record is made of it in the Court of Chancery.

[2.] When it is proposed to vacate a grant in England, a writ of *scire facias* issues from the Common Law side of the Court of Chancery, and where the grant is enrolled, and is there adjudicated, unless the pleadings terminate in an issue or issues of fact. When an issue of fact is formed, the pleadings

are made up in the Rolls office and the record is sent into the King's Bench, to be tried by a Jury, where, on a verdict had, the judgment is rendered.

[3.] In Georgia, grants are enrolled in the Secretary of State's office, which is an establishment not only distinct from any of the Courts of the State, but belonging to another and independent department of the Government.

[4.] A *scire facias* is always founded upon a record, and issues from and is made returnable to the Court where the record is kept; and when employed to revoke a grant, it must be for some matter within the body of the grant.

[5.] Without legislation, the Courts of this State cannot acquire jurisdiction by process of *scire facias* over disputed questions relative to grants.

[6.] A proceeding by bill to cancel a grant, is a doubtful question even in England, where the Lord Chancellor is the sole judge of the Common Law branch of the Court of Chancery, in which all grants are made; and the making of grants by the Chancellor by affixing the Great Seal to them, is deemed an act of the Court of Chancery, by which the Court makes a record of the King's grants.

[7.] How can this jurisdiction be exercised in the State, where grants are created by another branch of the Government, which makes and keeps a record of them?

[8.] The Act of 1837 (*Cobb's Digest* 657) extends only to the correction of errors which have occurred in the Executive Department in the issuing of grants, and not to a mistake alleged to have been made by the person originally registering the name of the persons entitled to draws.

[9.] The Act of 1827 (*Cobb's Digest* 656) makes provision only for the counties of Lee, Muscogee, Coweta, Troup and Carroll; and the Act of 1828 (*Cobb's Digest* 657) contains a provision for the correction of bad spelling and transcribing the names of land lottery drawers in Dooly, Houston, Monroe, Henry and Fayette.

[10.] No Act passed for Cherokee or the ten counties into which it was subdivided.

In Equity, in Gordon Superior Court. Decision on demurrer, by Judge JOHN H. LUMPKIN, September Term, 1854.

The bill in this case was filed by Dawson A. Walker, as guardian of certain orphan children, who were the heirs at law of William H. Stephens, who died a minor. It alleged that William H. Stephens "gave in for a draw" in the lottery of 1830 and 1831, as Berry Stephens' orphan, being the only child of Berry Stephens; that the person receiving the draw

Walker, guardian, &c. *vs.* Wells.

by mistake, omitted the apostrophe so as to enter the name, "Berry Stephens, orphan"; that said orphan drew lot No. 282 of 13th district 3d section of Gordon County, and a grant issued to Berry Stephens, orphan; that Wells had the grant in his possession and was in possession of the land; that the lot was sold at Sheriff's sale, as the property of one Absalom Holcombe, and purchased by Wells. The bill prayed for the correction of the grant.

On demurrer this Court dismissed the bill, on the ground that the Court had no jurisdiction to grant the relief prayed.

This decision is assigned as error.

WALKER; MCDONALD, for plaintiff in error.

WOFFORD; AKIN, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The bill alleges, that Berry Stephens died, leaving a widow and one child, William Henry Stephens, who removed from Jefferson to Dooly County; that while living in the 633d Militia District of Dooly County, William Henry Stephens, the minor, gave in for a draw in the Cherokee Land Lottery, as Berry Stephens' orphan; that he drew lot of land No. 228, in the 13th district of the 3d section of originally Cherokee, now Gordon County.

That in 1833, the widow of Berry Stephens intermarried with one Amos Lane, by whom she had three children, who are the complainants in the bill; that on the 5th of May, 1839, William Henry Stephens died, leaving the complainants as his only heirs at law; that the person receiving the draw of the said William Henry Stephens, by mistake or otherwise, omitted to insert the apostrophe at the end of the *s* in his name, so that the name, as taken down on the list, was Berry Stephens, orphan, instead of Berry Stephens' orphan.

The bill charges that some one, unknown to the complainants, procured a grant to be issued to Berry Stephens' orphan;

that the land was sold at Sheriff's sale as the property of one Absalom Holcombe, and purchased by Andrew J. Wells, who, in 1846, went into possession of the same and has remained in the occupancy thereof ever since.

The prayer of the bill is for the correction of the mistake in the grant, and for general relief.

The bill was, upon motion, dismissed at the hearing, for want of jurisdiction in the Court—and this ruling is assigned as error.

Is there Equity in the bill, conceding the Court had jurisdiction?

Suppose it be true, that no such person as Berry Stephens' orphan ever lived in Dooly County or any where else; and further admit what the bill does not charge, that Holcombe bought of some one personating the grantee, but without notice of the fraud, would not his title be good?

To maintain this bill, it was not only necessary to allege that Holcombe derived title through some fraudulent vendor claiming to be the grantee, but that he had notice of the imposture.

There is another question, however, which lies at the foundation of this controversy. Can the Court go behind the grant and examine the equity asserted in the bill? This is a new point, never adjudicated by this Court. We have repeatedly held, that a mistake of this sort could not be shown by parol proof; and intimated that *perhaps* it might be done by a direct proceeding instituted for the purpose. But are there not inherent and insuperable difficulties in the way?

[1.] [2.] In England, grants are issued by the Lord Chancellor, after affixing the Great Seal of the United Kingdom to them; and a record is made of them in the Court of Chancery. Consequently, when it is proposed, there, to vacate a grant, the writ of *scire facias* issues from the Common Law side of the Court of Chancery, where the grant is enrolled, and is there adjudicated unless the pleadings terminate in an issue or issues of fact. If they do, the pleadings are made up in the Rolls

office and the record sent into the King's Bench, to be tried by a Jury, where, on a verdict had, the judgment is rendered.

[3.] But in Georgia, grants are enrolled in the office of the Secretary of State, which is an establishment not only distinct from any of the Courts of this State, but belonging to another and independent branch of the government.

[4.] Now a *scire facias* is always founded upon a record, and issues from and is made returnable to the Court where the record is kept.

[5.] Without legislation, then, how can the Courts acquire jurisdiction by process of *scire facias* over disputed questions relative to grants? That is not all; a *scire facias* only reaches such matter as appears upon the face or within the body of the grant. It would afford, therefore, no adequate remedy for cases like the present.

In some of the States, provision has been made to obviate the difficulty, at least in part. In North Carolina an Act was passed (1798) directing a copy of the grant from the Secretary of State's office to be filed in the office of the Clerk of the Superior Court, upon which a *scire facias* might issue, calling upon the defendant to show cause why the grant, improperly issued, should not be annulled. (*Taylor's Rev. Appendix.*)

[6.] As to proceeding by bill to cancel a grant, but few instances can be found in the British books; and some of these are of doubtful authority.

In *Attorney General vs. Vernon et al.* (1 *Vernon's Rep.* 277) (1684) the defendant's Counsel insisted that no precedent existed to repeal Letters Patent by an English bill in Chancery. That it was *causa primæ impressionis*. But the Lord Keeper said, "The question was short—whether there be fraud or not. If a fraud, it was properly relievable in that Court. It was not fit (he said) that such matter should be stifled upon plea." He, therefore, reserved the benefit of it till the hearing, because "he would not give any countenance to such a case."

The same case came up again, (*Vide Post, p.* 370) and like the case under discussion was argued at great length and with much ability. Counsel for the defendants re-affirmed, that no prece-

dent could be found of a grant being destroyed by English bill; and they insisted upon the application of *Littleton's* rule, *that what never was never ought to be.* But the Court overruled the objection, and held that an English bill was the proper remedy in this case.

Lord Chief Baron *Montague* said, that though there was no precedent of any such suit, yet all precedents had a beginning; and that it was the province and privilege of a Court of Chancery to create precedents; that the Court must find out new ways to obviate the mischiefs of the age, for *crescit in orbe dolus.*

Lord Chief Justice *Jones* said, the pleadings in the case being very long and the proofs voluminous, he would not (having but an old, decayed memory and wanting the use of hands which might in some measure supply that defect) repeat all the circumstances of the case: but in a few words would deliver his opinion. He was sorry that Col. *Vernon*, an honest gentleman and of known loyalty, should be the occasion of making a precedent of this nature; but there was a time when all precedents began; and as much huddle and haste had been used in passing this grant, he thought his Lordship might very well decree the patent to be delivered up and cancelled.

Lord Chancellor *Jefferies* said he was clear, that had this patent passed ever so regularly, yet the Court of Chancery might have decreed it to be delivered up. He said he could wish the Crown had not parted with so many flowers, as he was persuaded there would not have been so many rebellions. And although Col. Vernon was an honest gentleman of good quality; still, the honor of *Tutbery* was of that *vast* extent, and so many noblemen had it that it was not fitting for a person of Col. Vernon's degree.

Chancery, in England, not only decrees the revocation of patents, but to *amortize* letters of reprisal, and to scold the Dutch Ambassador upon the back of it, by the Chancellor's saying, that " he never came into the King's presence but that he was making fresh complaints. See *The King vs. Carew,* (1 *Vernon,* 54.)

Walker, guardian, &c. vs. Wells.

[7.] If this power be doubtful even in England, where the Lord Chancellor is the sole Judge of the Common Law branch of the Court. of Chancery, in which all grants are made, and the making of grants by the Chancellor is considered an act of the Court of Chancery, by which the Court makes a record of the King's grants, how can this jurisdiction be exercised in this State, where the Courts have no connection with nor power over the record of grants?

One member of this Court, at least, holds that inasmuch as the Governor of Georgia has authority to issue grants, that he alone must be the judge of the sufficiency and regularity of the various preliminary steps required to be taken toward the completion of a legal title, and to see that these prerequisites have all been complied with. And that the acts of the Executive, in this respect, are as conclusive as the Statutes of the Legislature or judgments pronounced by Courts of Justice.

Without admitting this proposition to the extent stated, which I do not, but on the contrary, entertaining no doubt but that there are cases where the validity of the grant is necessarily examinable, both *at Law* and in Equity; and moreover, holding, as I do, that cases may arise where equitable rights, originating before the date of the grant, may be inquired into; still, I have taxed my ingenuity in vain to discover what relief to grant in the present case.

The cancellation of the grant would vest the title in the State and not in the complainant. A conveyance from Wells, the tenant in possession, might or might not afford redress, because it does not appear, from the bill, that Wells' title is deducible from Berry Stephens' orphan, the grantee. Even if it did, before rendering such a decree, or indeed any other, should not the State, by its proper officer or agent, be made a party? And is not special legislation needed for just such a case?

[8.] The Act of 1837, (*Cobb's Dig.* 657,) does not embrace this case. It extends only to the correction of errors which have occurred in some of the offices in the Executive Department in the issuing of grants; whereas, this mistake is alleged

to have been made by the person originally registering the names of the drawers in the 633d district of Dooly County.

[9.] The Act of 1827, (*Cobb's Digest*, 656,) makes provision for just such cases as this, in the counties of Lee, Muscogee, Coweta, Troup and Carroll; and the Act of 1828, (*Cobb's Digest*, 657,) contains a similar provision for the bad spelling and transcribing the names of persons entitled to draws in Dooly, Houston, Monroe, Henry and Fayette.

[10.] But as yet, no Act has been passed for Cherokee, where this land was located, or for any one of the ten counties into which it was sub-divided.

Upon the whole, we think the Court was right in refusing to exercise jurisdiction in the case made.